UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
CHARLES JOSEPH SILVIA, JR.,          )
                                    )
        Plaintiff,                   )
                                    )
        v.                           )   Civil Action No. 13-11681-DJC
                                    )
CAROLYN COLVIN, Acting Commissioner, )
Social Security Administration,      )
                                    )
        Defendant.                   )
_____ )

## MEMORANDUM AND ORDER

CASPER, J.                                              September 22, 2014

### I.      Introduction

Plaintiff Charles Joseph Silvia, Jr. ("Silvia") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") in January 2012. R. 15, 105-06.[1] Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Silvia now brings this action for judicial review of the final decision of Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on February 20, 2013, denying his claim. R. 12-32. Before the Court are Silvia's motion to reverse or remand, D. 13, and the Commissioner's motion to affirm the decision of the ALJ. D. 15. For the reasons discussed below, the Commissioner's decision is AFFIRMED.

---

[1] Citations to the administrative record in this case, filed at D. 9, are referenced as "R."

1

**II.     Factual Background**

Silvia was 42 years old when he ceased working on February 9, 2010.  R. 46, 189.  He previously worked as a gas station attendant and cashier.  R. 46-48.  Prior to his employment at the gas station, Silva worked as a baker in a donut shop.  R. 50.  In his January 1, 2012 and January 30, 2012 applications for SSI and SSDI, respectively, he alleged disability due to mental illness, lower back pain, insomnia and impulse control.  R. 107, 120.  Silva alleged that his disability began on May 1, 2010.  Id.

**III.    Procedural Background**

Silvia filed claims for SSDI and SSI, asserting that he had been unable to work as of May 1, 2010.  R. 107, 120.  The Social Security Administration ("SSA") initially denied his claims on April 26, 2012, R. 135, and again upon reconsideration on September 13, 2012.  R. 145-50.  On October 2, 2012, Silvia requested a hearing before an ALJ, R. 153-54, and a hearing via video was held on January 24, 2013.  R. 40.  The ALJ presided over the hearing from Boston, Massachusetts, Silvia and his counsel appeared in New Bedford, Massachusetts and a vocational expert ("VE") testified via telephone.  R. 42.  In a written decision dated February 20, 2013, the ALJ ruled that Silvia did not have a disability, as defined by the Social Security Act, and denied Silvia's claims.  R. 28.

Silvia requested a review of the ALJ's decision and the Appeals Council denied the request on May 15, 2013.  R. 1-4.  Accordingly, the ALJ's decision is the final decision of the Commissioner.  R. 1.

**IV.    Discussion**

    **A.    Legal Standards**

        *1.    Entitlement to Disability Benefits and Social Security Income*

A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1); 20 C.F.R. § 404.1505(a). The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process to determine whether an individual has a disability, and, thus, whether the benefits should be granted. 20 C.F.R. § 416.920. All five steps are applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have or has not had within the relevant time period a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the condition for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, where the impairment does not meet the conditions of one of the "listed" impairments, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his RFC, education, work experience and age, is unable to do any other work, the application is granted. Id.

  2.  *Standard of Review*

The ALJ's role is to use her discretion to consider and weigh evidence and make findings and credibility determinations. See Whitzel v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass.

2011). Under 42 U.S.C. § 405(g), this Court must accept the factual findings of the Commissioner as conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence may be found where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1991). The reviewing Court must adhere to these findings "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzel, 792 F. Supp. 2d at 148 (quoting Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

    **B.    <u>Before the ALJ</u>**

        *1.    Medical History*

There was extensive evidence about Silvia's medical history, including diagnoses and treatment, before the ALJ, particularly in regard to the physical and mental impairments upon which Silvia relied in claiming disability in his applications for SSDI and SSI benefits. R. 21-24, 217.

            i.    Physical Impairment

Silvia reported symptoms "such as chronic low back pain, bilateral knee pain, fatigue, shortness of breath, and limited mobility." R. 21. A lumbar MRI taken in February 2010 showed second degree spondylolisthesis at L4-L5 and "severe neural foraminal stenosis bilateral." R. 289. These findings were consistent with a previous MRI from 2005, and Silvia was able to work between 2005 and 2010 even with his back impairment. R. 22, 289. Upon physical examination by his primary care physician, Dr. Hugo Jauregui ("Dr. Jauregui"), Silvia exhibited "normal strength and tone," "normal gait and station," no tenderness, an ability to

tiptoe, and an ability to get on and off the examining table with no problem. R. 281. His early treatment included oxycodone to manage lower back pain. R. 289. However, by March 2011, Dr. Jauregui informed Silvia that "there [was] no structural disease on his spine and there [was] no justification for chronic dependence on narcotics." R. 273. He noted Silvia's reported daily use of marijuana, terminated his Oxycodone prescription, and referred Silvia to a local pain clinic for further evaluation. Id. The clinic advised Silvia to use ultra, baclofen and nortriptyline to manage his pain. R. 22. In the spring of 2011, Silvia reported to Dr. Jauregui that his prescription medication was not effectively managing his pain and that he had instituted an ibuprofen regimen. Id. Later in 2012, Silvia resumed oxycodone and ibuprofen for his ongoing back and knee pain. Id.

ii. Mental Impairments

Silvia was diagnosed with depression and panic disorder with agoraphobia in February 2012, and eventually visited a mental health professional, Dr. Walter Brown ("Dr. Brown"), who noted Silvia's depression, irritability and poor sleep. R. 23, 301-04. Dr. Brown diagnosed Silvia with adjustment disorder, anxiety disorder and impulse control disorder with a Global Assessment Functioning ("GAF") of 50.[2] R. 23, 304.

In September 2012, Silvia started seeing mental health professionals at the Family Services Association facility. R. 23. Vincent Millard ("Millard"), a mental health counselor, noted diagnoses of major depressive disorder and panic in his mental health assessment and

---

[2] The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning and refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–33 (4th ed., text rev. 2000) ("DSM–IV"). A GAF of 41-50 is indicative of a "serious impairment in social, occupational or school functioning." DSM-IV 34; Amaral v. Commissioner of Social Sec., 797 F. Supp. 2d 154, 158 n. 1 (D. Mass. 2010).

assigned Silvia a GAF score of 55.³ R. 23, 345-46. Later that year in November, Silvia also began treatment with clinical nursing specialist, Irene Lang ("Lang"), who confirmed his diagnoses and assigned him a GAF score of 56. R. 23, 327-28. She prescribed Silvia abilify and depakote and by December of that year, Silvia reported feeling better. R. 328-31. In January 2013, Millard and Lang completed a Psychiatric Review Technique Form ("PRTF"), evaluating Silvia's functioning since September 2012. R. 25, 355. They noted "marked" limitations in activities of daily living, social functioning, and concentration, persistence or pace, and three episodes of decompensation, each of extended duration. R. 25, 365. Millard and Lang also completed a mental RFC assessment, opining that Silvia was markedly limited in his abilities to sustain concentration and persistence, interact socially and adapt. R. 25, 372-75.

  2. *ALJ Hearing*

At the January 24, 2013 administrative hearing, the ALJ heard testimony from Silvia, the VE, Joseph Goodman, and a friend of Silvia's, Michelle Giasson ("Giasson"). R. 40.

Silvia testified that his last day of work was February 9, 2010. R. 46. On that date, he was laid off from the position he held for a little more than a year as a gas station attendant because he failed to disclose in his initial employment application that he was related to another employee. R. 46-47. Silvia previously worked for "many, many years" as a donut shop baker and cited "moving" as his reason for leaving that position. R. 50. He received unemployment benefits until June or July 2011 and told the ALJ that he tried to find another job as a cashier during that time, but was unsuccessful. R. 48.

When questioned by the ALJ about his personal life, Silvia testified to having a nine-year-old daughter whom he watched after school a couple of times a week. R. 51-52. He

---

³ GAF scores in the 51–60 range indicate "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." DSM–IV 34.

explained that he sometimes walked to see her and would visit the park with her but could not play with her there. R. 52-54. Silvia had a cane with him during the hearing, which he told the ALJ he used although it was not prescribed by his doctor because his leg would sometimes go numb and he "would rather have one than fall on the sidewalk every couple of days." R. 57.

Upon further questioning about the type of treatment he received for his pain, Silvia stated that he took over-the-counter medicine for a combination of pain, namely knee pain and back pain, exacerbated by damp or cold weather. R. 57-58. He admitted to using marijuana "all the time" a few years prior because "it was the only thing that worked for [his] pain," but stated that he was using it "very rarely" at the time of the hearing. R. 59. His doctor at one point prescribed him percocet, but discontinued the prescription because he did not want Silvia to become addicted. R. 58. Silvia also mentioned taking symbicort for acute bronchitis and emphysema and noted that cold weather aggravated his breathing problems. R. 58, 66. Later in the hearing, Silvia again referenced his back pain, stating that he usually had to sit back or lay down on the couch at home to relieve the pressure. R. 63-64. When asked how often he had to lie down, Silvia stated that he could stand, sit or walk for about twenty minutes. R. 64. He also said he could walk only about a city block before he had to stop because of his breathing problems and pain, depending on the weather, and that he would "be lucky if [he] could lift [ten] pounds." R. 67-68. Silvia's counsel questioned him about psychiatric notes referencing "motor twitching," to which he replied that he had constant motor issues that persisted for years (i.e., his leg was "always shaking" or he was always "bouncing something" in his hand). R. 60-61. He also stated that he slept three or so hours at a time at most, making him tired during the day and causing him to "nod off" sometimes. R. 61.

The ALJ asked Silvia about his hobbies, to which he testified that he liked to bowl and read, but could not "concentrate on the same thing for any length of time." R. 54-55. He also sometimes played video games and watched television, but noted that he often switched channels because he "[could not] maintain focus on the program." R. 55. Later in the hearing, he again brought up his inability to maintain focus or concentration, revealing that it prevented him from staying interested in "everyday things like news and sports," finishing tasks, or following a baking recipe. R. 63-64, 68. He also stated that he had little appetite once he started eating food and that his weight fluctuated. R. 62.

Silvia revealed that he did not engage in any kind of social activity because he was "afraid to go out because there [were] too many people on the street," and he was paranoid about people sneaking up behind him. R. 64-65. He went shopping only if someone accompanied him; otherwise he would "freak out" and become "panicky" around crowds. R. 59-60. He also testified to having random panic attacks once or twice a month, which he occasionally was able to resolve by sitting down and trying to "block everything else out." R. 65. Sometimes he heard voices whispering and thought of suicide, but would not follow through on it because it would devastate his daughter. R. 62. In terms of formal mental health treatment, Silvia stated that he began meeting with a counselor and psychiatrist in September. R. 60. He explained that he had wanted to start treatment earlier, but was unable to do so. Id.

The ALJ next questioned Giasson, who testified that she had been friends with Silvia for twenty years and that Silvia had lived with her for seven or eight months. R. 69-70. She stated that she was disabled, did not work and was home during the day. R. 70-71. From her account, Silvia often watched television during the night and napped during the day; he did not help her with household chores; he spent most of his time on the couch when he was at home; he had

8

difficulty climbing stairs; and he did not leave home often. R. 71-72. She also testified that Silvia's mood was "unpredictable" and that, in terms of concentration, he "[didn't] stick with anything." R. 73.

The VE testified to the job prospects of a hypothetical person with Silvia's age, education and work experience; who was limited to a light range of work; could not stand or walk for more than two hours total in an eight-hour day; could climb ramps or stairs occasionally, but never ladders; occasionally could balance, stoop, kneel, crouch, but never crawl; had to avoid moderate exposure to irritants; and was limited to simple, routine tasks and occasional decision making, changes in work setting and interaction with the public and coworkers. R. 76-77. He stated that such a person would not be able to perform any of Silvia's prior work, but could perform "light and sedentary jobs," such as bench assembler and press operator. R. 77. The VE further testified that if the person was unable to interact with the public, he could still perform those jobs. R. 77. However, the VE testified that if the individual could not interact with coworkers then those jobs would be precluded. R. 79. Upon questioning by Silvia's attorney, the VE testified that "if the hypothetical individual had marked difficulty in maintaining concentration, persistence and pace," he would be precluded from those jobs. R. 78. The VE considered "marked difficulty" to be "frequent" and approximately "two-thirds of the time or more." Id.

### 3. *Findings of the ALJ*

The ALJ followed the five-step sequential process to evaluate Silvia's claims. At step one, the ALJ found that Silvia had not engaged in substantial gainful activity since May 1, 2010. R. 17. At step two, the ALJ found that Silvia had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral knee, recurrent bronchitis, mood disorder, learning disorder, anxiety disorder and cannabis dependence

disorder. Id. At step three, the ALJ concluded that Silvia did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Social Security regulations and that he had the RFC to perform light work. R. 18, 20. At step four, the ALJ concluded that Silvia could not perform his past work. R. 27. The ALJ, however, concluded at step five that he could perform "light work" except that:

> [H]e could only stand or walk for about two hours in an eight-hour workday. In addition, the claimant could never climb ladders, ropes, or scaffolds, and he could only occasionally climb stairs or ramps. The claimant could occasionally balance, stoop, kneel, crouch, or crawl. The claimant should avoid moderate exposure to pulmonary irritants such as dusts, fumes, odors, gases, or areas of poor ventilation. The claimant could perform simple, routine tasks involving only occasional decision making and occasional changes in the work setting. The claimant could work around coworkers and supervisors but with only occasional interaction. The claimant should avoid jobs that require interaction with the general public.

R. 20. The ALJ further found at step five that such work existed in significant numbers in the national economy. R. 27. Accordingly, the ALJ concluded that Silvia was not disabled as defined by the Social Security Act. R. 28.

### C. Silvia's Challenges to the ALJ's Findings

Silvia argues that the ALJ erred at step five in concluding that he could do light work and was capable of performing jobs that exist in significant numbers in the national economy. D. 13-1 at 3, 5. Silvia challenges the findings with respect to the ALJ's assessment of his credibility and evaluation of opinion testimony. Id. at 6-12. Specifically, Silvia claims that the ALJ erred in denying his claims because: (1) the ALJ failed to evaluate properly Silvia's credibility, id. at 5-8; (2) the ALJ ignored the "general rule" that the opinions of non-examining physicians "deserve little weight," id. at 8; (3) the ALJ did not give sufficient weight to evidence from the consultative examiner and treating mental health professionals, which supported a finding that Silvia had marked or serious psychiatric impairment, id. at 9-12; and (4) the ALJ did not

10

consider testimony offered by the VE that no alternative jobs existed for a hypothetical individual with marked psychiatric impairments, id. at 13-15.

### *1. Credibility of Claimant*

First, Silvia argues that the ALJ erred in assessing his credibility because his testimony "concerning his daily activities demonstrates an inability to perform substantial gainful activity on a regular and continuing basis as defined by SSR 96-8p." D. 13-1 at 7. Specifically, Silvia points to his testimony regarding his inability to concentrate, difficulty walking, psychiatric impairments and psychomotor motions. Id. at 5-6.

The ALJ concluded that while Silvia's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." R. 21. "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citing Rodriguez, 647 F.2d at 222). Although an ALJ's analysis of a claimant's credibility requires consideration of the factors enumerated in Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28-29 (1st Cir. 1986) (detailing the factors, which include: (1) the nature, duration, frequency, and intensity of any pain; (2) aggravating factors; (3) the type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) other treatments; (5) functional restrictions; and (6) daily activities), an ALJ is not required to discuss every factor in its decision. See, e.g., Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 161-62 (D. Mass. 2010).

The Court may overturn an ALJ's credibility determinations only when it concludes that the ALJ has ignored evidence, misapplied the law or judged medical matters that should be left

to experts. See, e.g., Nguyen v. Chater, 172 F.3d 31, 35-36 (1st Cir. 1999) (remanding case where ALJ improperly rejected records of treating physician, leading to findings unsupported by substantial evidence). The Court may also remand cases when the ALJ has provided insufficient explanations for findings or has failed to consider relevant evidence. See Seavey v. Barnhart, 276 F.3d 1, 12 (1st Cir. 2001). Here, however, the ALJ provided "sufficiently specific findings in support of her credibility determination," D. 16 at 11, and her determination that the medical records undermined Silvia's testimony as to the limiting effects of his symptoms. D. 16 at 11-13.

The ALJ properly considered the record and factors reflecting Silvia's credibility regarding his alleged inability to work and his impairments. The ALJ noted that Silvia, after working as a donut shop baker for more than twenty years, sustained employment as a gas station attendant for more than a year and that Silvia's latter employment ended only because he failed to disclose his familial relationship with another employee in his initial job application. R. 21; see SSR 96-7p, 1996 WL 374186, at *5 (1996) (including as relevant evidence in credibility determination "prior work record and efforts to work"). As further evidence of Silvia's ability to work, the ALJ noted that Silvia received unemployment benefits until June or July 2011, while he allegedly was disabled, which required him to represent that he was ready, able and willing to work. R. 25; see Colon v. Astrue, 841 F. Supp. 2d 495, 501 (D. Mass. 2012) (noting that claimant was actively looking for a job during alleged disability period and had "also been collecting unemployment benefits for which she is required to certify that she [was] able to work").

As to Silvia's claim that the ALJ diminished his testimony regarding his difficulty walking, D. 13-1 at 5, this Court notes that the ALJ cited Dr. Jauregui's report of Silvia's

unchanged lumbar MRI results between 2005 and 2010, indicating that his back impairment remained stable over the years. R. 22, 289. Moreover, while Silvia testified that he continued to experience back and knee problems during bad weather, his 2012 physical examinations remained stable and within normal limits. R. 22; see, e.g., R. 309, 311, 314. His pain was largely managed with over-the-counter medication after 2011. R. 57-58. The ALJ also relied on Silvia's own accounting of his daily activities, which included attending to personal care tasks, handling personal finances, regularly watching his daughter, walking or riding the bus and playing video games. R. 24-25; SSR 96-7p, at *5 (allowing ALJ to consider claimant's daily activities in assessing credibility regarding statements about pain or symptoms).

In terms of Silvia's credibility regarding statements about his psychological impairments, the ALJ noted that the record contained no evidence of psychiatric hospitalization and that Silvia's GAF scores of 55 and 56 "reflect[ed] the presence of only moderate mental limitations." R. 24. Dr. Jauregui's medical notes consistently reported that Silvia had good judgment, normal mood and affect, was active and alert, and was oriented to time, place and person. R. 260, 263, 269, 277, 280. Moreover, while Silvia reported having "mental illness" in his January 2012 SSI and SSDI applications, R. 107, 120, he testified that he did not begin mental health treatment until September 2012. R. 60; Irlanda Ortiz, 955 F.2d at 769 (considering "gaps in the medical record as 'evidence'" as to severity of impairment). Silvia also reported positive benefits from taking medication and participating in counseling sessions. R. 24; see, e.g., R. 330-31; see Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) (noting that "[i]mplicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work").

13

To the extent Silvia argues that Giasson's testimony corroborated his own, the ALJ appropriately explained the reasons for discounting her testimony, namely, that it was inconsistent with the record of medical evidence. R. 26.

### 2. *Opinion Evidence*

Silvia also argues that the ALJ incorrectly evaluated the opinion evidence. D. 13-1 at 8-13. Specifically, he first contends that the ALJ "favor[ed] the assessment" of two non-examining advisors, awarding them "great weight." Id. at 8. Contrary to Silvia's suggestion otherwise, id., the report of a non-testifying, non-examining physician "is entitled to evidentiary weight, which 'will vary with the circumstances, including the nature of the illness and the information provided the expert.'" Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (quoting Rodriguez, 647 F.2d at 223). Greater weight may be awarded where the opinions of the non-examining physicians are consistent with the record as a whole. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (noting that "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion").

The ALJ's decision to afford great weight to the opinions of state agency medical consultant, Dr. John Jao ("Dr. Jao"), and state agency psychological consultant, Dr. John Burke ("Dr. Burke") was appropriate where these opinions were consistent with the evidence of record. R. 26. Dr. Jao's physical assessment indicated that Silvia was capable of lifting ten pounds frequently and sitting, standing and/or walking for six hours in an eight-hour workday, R. 114-15, while Dr. Burke opined in his mental assessment that Silvia could "understand and recall simple information," sustain focus for two hour segments over an eight-hour workday, relate "adequately in simple social situations" and respond to simple demands, R. 117. These

14

respective assessments comport with physical and mental examination findings that were within normal and stable limits.  See, e.g., R. 259-60, 263-64, 270, 273-74, 339.

Silvia also argues that the ALJ erred in weighing the degree of his psychiatric impairment and its impact on his ability to perform light work.  D. 13-1 at 9-14.  He argues that the entire psychiatric record, including the opinions of treating physicians and the consultative examiner, corroborates a finding that his psychiatric condition "exceeds that of the finding of the ALJ in establishing the additional non-exertional impairments superimposed of the physical RFC of 'light.'"  Id. at 12.  To support his argument, Silvia first contends that the ALJ improperly weighed the GAF scores assigned to him by Dr. Brown, Milliard and Lang of 50, 55, and 56, respectively.  Id. at 9-10.  He argues that the ALJ should have afforded greater weight to the GAF score assigned by the consultative examiner, Dr. Brown, which indicated a serious impairment in social, occupational or school functioning.  Id. at 10.  Silvia contends that a GAF score of 50 is consistent with the mental RFC assessment and PRTF submitted by Lang and Millard, which indicated "marked limitation in many of the characteristics needed to perform adequately in substantial gainful activity."  Id. at 12.  Though Millard and Lang assigned Silvia GAF scores of 55 and 56, respectively, indicating only moderate impairment, Silvia contends that the mental RFC assessment and PRTF made clear that his mental impairment was, in fact, serious.  Id. at 11-12.  Therefore, Silvia argues that the ALJ should have considered more closely the combined evidence, and given the opinions of Millard and Lang with respect to the mental RFC assessment and PRTF more than minimal probative weight.  Id. at 11-13.

Silvia's argument that the ALJ improperly considered the degree of his psychiatric impairment, however, is not supported by the weight of the evidence in the record.  First, Dr. Brown based his GAF determination on assessments taken prior to the start of Silvia's mental

15

health treatment in September 2012. R. 301. Treatment records indicate that Silvia's mental state improved with medication and counseling from the time of Dr. Brown's determination. R. 316-33. Since the "evidence of treatment [did] not support the claimant's allegations of disabling mental impairment," R. 24, the ALJ properly found that the degree and extent of Silvia's psychiatric impairment was moderate rather than severe. See Summers v. Astrue, No. 10-11792-DJC, 2011 WL 5508919, at *12 (D. Mass. Nov. 10, 2011) (quoting Eaton v. Astrue, No. 08-cv-186-PB, 2009 WL 2015903, at *7 (D.N.H. July 7, 2009)) ("GAF scores offer a snapshot of one's state at the time of the evaluation, but for an impairment to functionally equal a listing it must also meet the duration requirement, about which the GAF score says nothing"); 20 C.F.R. § 416.909.

Similarly, the ALJ's decision to assign "minimal probative weight" to the opinions of Lang and Millard was not in error. Although Milliard and Lang were not "acceptable medical sources" or "treating sources" under the Social Security laws and regulations, SSR 06-03p, 2006 WL 2329939, at *1-2, the ALJ did not ignore them, but took them into account in reaching her decision. R. 25-26; see Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (quoting SSR 06-03p, 2006 WL 2329939, at *1-2). In assessing the evidence in the record, including Millard's and Lang's opinions, the ALJ has wide discretion and "is only constrained by the duty to reach a conclusion supported by substantial evidence in the record." Gagnon v. Astrue, No. 11-10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012) (citing 20 C.F.R. § 416.927(d)(2)).

The ALJ properly considered Millard's and Lang's opinions contained in the mental RFC assessment and PRTF, and found them to be inconsistent with evidence of the claimant's daily activities and conservative approach to mental health treatment. R. 25-26. The ALJ also noted the inconsistency between GAF scores indicative of moderate mental impairment and an

16

individual with "marked" mental limitations in the relevant areas and ultimately afforded greater weight to the GAF scores. R. 26. Since the record indicates that Silvia engaged in activities such as caring for his daughter, experienced improved mood with medication, and only required weekly mental health counseling sessions, the ALJ's judgment is supported by substantial evidence. R. 51-54, 316-49; see Rooney v. Astrue, No. 10-11601-DJC, 2011 WL 6026908, at * 10 (D. Mass. Dec. 5, 2011) ("duty of the ALJ to resolve [any] conflicts in the evidence, and this Court must defer to the ALJ's judgment as long as it is supported by substantial evidence") (citation and internal quotation mark omitted).

Accordingly, the ALJ's decision to afford minimal weight to the mental RFC assessment and PRTF, even in light of claimant's counsel's suggestion that the mental RFC assessment and PRTF were co-signed by Silvia's psychiatrist, was not improper. R. 25. Typically, controlling weight is afforded a treating physician's opinion if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *3; see Abubakar v. Astrue, No. 11-cv-10456-DJC, 2012 WL 957623, at *10 (D. Mass. Mar. 21, 2012) (stating that ALJ has discretion to assign weight to treating physician's opinion based on its consistency with overall record). However, the ALJ determined that the opinions contained in the mental RFC assessment and PRTF did not warrant controlling weight, noting, "it seems inconsistent that an individual with 'marked' mental limitation in the areas in question would be able to shop for food, read books, watch television, attend his appointments, play video games, keep his home clean, and care for his young daughter." R. 25. Accordingly, the Court concludes that the ALJ's determination was sufficiently supported by the record. See Rodriguez, 647 F.2d at 222.

### 3. Vocational Expert Testimony

Finally, Silvia contends that the ALJ erred by relying on the VE's testimony that he could perform jobs that exist in significant numbers in the regional economy. D. 13-1 at 14. He argues that the ALJ relied on the VE's answer to a hypothetical involving moderate psychiatric impairment, but failed to consider the VE's response to an altered hypothetical involving the job prospects of an individual with marked or serious psychiatric impairment, where he responded that no jobs existed. Id. "[T]o constitute substantial evidence, the vocational expert's opinion must be in response to a hypothetical that accurately describes the claimant's impairments." Cohen v. Astrue, 851 F. Supp. 2d 277, 284 (D. Mass. 2012) (citations omitted). For the reasons discussed previously, the record contains substantial evidence to support a finding that the claimant's mental impairments are moderate, rather than marked or severe. Since the original hypothetical accurately described the claimant's mental impairment, the ALJ properly relied on the VE's answer in making the disability determination.

## V. Conclusion

For the above reasons, the Commissioner's motion to affirm, D. 15, is ALLOWED and Silvia's motion to reverse or remand, D. 13, is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge